Linda CAMPBELL (now Wright), Appellant,

v.

Arnold CAMPBELL, Appellee.

Court of Appeals of Kentucky.

March 27, 1970.

Scott Collins, Prestonsburg, for appellant.

W. W. Burchett, Prestonsburg, for appellee.

PALMORE, Judge.

Linda Campbell appeals from a judgment restoring to Arnold Campbell, her former husband, custody of their two infant children, a boy and girl, who are now nine and seven years old, respectively.

The record was filed with this court on November 13, 1969. On December 23, 1969, appellant asked for and was granted, for sufficient cause and without objec-

tion, a 20-day extension of time in which to file her brief. It was duly filed on January 9, 1970. On February 20, 1970, the case was submitted for decision pursuant to RCA 1.260, the time for filing of appellee's brief having expired. On March 5, 1970, appellee moved for an extension of time until April 30, 1970, in which to file a brief, citing pressing business and, in general terms, "illness of the stenographers and counsel associated with Attorney for Appellee." This motion was passed to the merits.

There is no subject of more importance in the administration of justice than the welfare of children. In custody and support cases time is of the essence. This is reflected in RCA 1.185, which provides that appeals "involving the custody or support of children, of which the Court is notified in the statement of appeal or otherwise, will be advanced without motion." In such cases we are bound to treat motions for extensions of time more strictly than might otherwise be so. It is better that a busy lawyer refer the case to other counsel than to keep the child waiting in a line of other clients. That policy moves us to get on with the disposition of this appeal without further delay.

The divorce proceeding was instituted by Linda, the wife, in May of 1967, and was not contested. The ground was cruel and inhuman treatment, KRS 403.020(3) (b). An agreement was filed in which the property rights of the parties were settled and Linda waived any claim to alimony, and which provided that the children were to remain in her custody subject to reasonable visitation by Arnold, the father, and Arnold was to pay $100 per month for their maintenance.

In due course an interlocutory divorce decree was entered adopting the provisions of the agreement. However, at some time before final judgment Linda embarked upon an educational course and, by agreement, the interlocutory order was amended to place custody of the children with Arnold, subject to reasonable visitation, including all of the customary summer school vacations, and relieve Arnold of maintenance payments except for such periods as Linda was entitled to have the children with her. The amending order, entered July 28, 1967, specified that "the foregoing provisions are made in contemplation of the plaintiff completing an educational course and following which and when the plaintiff becomes financially able she may be awarded the full care, control and custody of the children."

Final judgment of divorce was entered on November 17, 1967. On March 18, 1968, Linda filed a motion for transfer of custody, stating that she had completed her educational course and was now able and ready to assume full care and control of the children. Meanwhile she had remarried. Arnold filed a counter-motion asking that the children be left with him. On April 3, 1968, following a hearing, the trial court ordered that the children remain with Arnold until the end of the current school year and then be transferred permanently to Linda, subject to reasonable visitation and a right on Arnold's part to have the children in his custody for two months each year. This order directed support payments of $75 per month while the children were with their mother.

So far so good. Linda and her husband moved to Osborn, Kentucky, and enrolled the children in school there. However, an expected job for Linda's husband fell through, resulting in a financial squeeze, and they decided to go to Ohio to look for employment. This was in September of 1968, in the early part of the school year. Linda's stepmother at Prestonsburg was willing to take care of the children while she and her husband sought to re-establish themselves, but Linda felt that they should be with their father instead, so she asked him if he would keep them through the 1968–69 school year. After securing permission from his father and stepmother, with whom he makes his home, Arnold agreed to take the children. He says he did not agree that Linda could have them back

at the end of the school year, but he admits he knew that was Linda's understanding at the time.

At this stage of the proceedings it seems obvious that Arnold and Linda were on reasonably good terms and were making a good faith effort to cooperate for the best interests of their children. As a matter of fact, Arnold offered to pay Linda's stepmother if she would take them but, as we have said, Linda preferred that they be with him. It is not without significance, however, that he thought it necessary to obtain permission from his father and stepmother, because the evidence strongly suggests that the grandfather may be the source of trouble in the case.

During the 1968–69 year the children attended school at Auxier, the town in which Arnold lives with his father, stepmother and an adult stepbrother. Meanwhile, Linda and her husband both found good employment and purchased a new home in what evidently is a nice, modern neighborhood of Columbus, Ohio. However, it became increasingly difficult for Linda to gain access to the children at the paternal grandfather's home in Auxier, and on one or more occasions she found it necessary to obtain counsel and threaten legal action in order to get to see them. Finally, after being told by Arnold that she could not have the children any more, Linda again sought legal advice, and on May 14, 1969, accompanied by a deputy sheriff, she went to the school and got them. At this time, it will be recalled, by virtue of the order of May 3, 1968, she had the prima facie right to their custody. Arnold then moved for a transfer of custody on the ground of a change in conditions. Following a hearing on June 6, 1969, the trial court entered an order in his favor, from which order Linda now appeals to this court. The order, incidentally, makes no provision for or mention of any right of visitation on her part.

The record does not reflect the slightest suggestion that Linda is unfit, morally or otherwise, to raise the children, nor do Arnold and his family advance any reasonable cause for her visits or attempted visits to their home having been unwelcome unless, perhaps, they resent her remarriage and have a distaste for the prospect that the children may come into contact with ethnic groups in Columbus, Ohio, which are not represented in Auxier, Kentucky. We quote, for example, from the elder Campbell's testimony as follows:

Q. "There has been some testimony here about you running her and her present husband off down there and telling them not to get on your property?"

A. "I told them, I don't deny a word of it."

Q. "What did you tell her?"

A. "I told them to stay off, to stay out of my house and not to come in. I have told her a dozen times and I told her * * *"

Q. "What objection did you have to that?"

A. "They just ain't got no business in the house and they ain't got no business down there."

Q. "Well, now, let me ask you this question: If the Court awards the custody of these children to this boy and gives her the right to visit those children and come down there to see them, would that be satisfactory to you?"

A. "If she comes down there and leaves that man outside. He ain't got no business coming in my house. That is two different people, she could come in."

Q. "Would you be kind and nice to her?"

A. "Yes, I would ask her in, but I don't want him in my house. I ain't going to lie to you about it."

Q. "But you have no objection to her coming there?"

A. "No, she can come and visit the children."

\*     \*     \*     \*     \*     \*

Q. "Do you have any objection to your grandchildren associating with colored people?"

A. "Yes, I am, but there ain't none in this country. I am in a way.

MR. BURCHETT: "Now, we object because there is nothing like that involved in this case."

BY THE WITNESS: "There is no colored children involved in this case and there ain't none in this country except up at Wheelwright and up there above Allen at Tram."

Q. "Do you object to the children going to school with Hungarians—what we call 'Hunkies'?"

A. "It don't make no difference to me now about Hunkies but where they are going to school at down there they ain't got nary a one."

\*     \*     \*     \*     \*     \*

Q. "Just answer my question. Do you object to her taking them to where there are other ethnic groups where the children would go to school?"

A. "It would be left up to whatever the Judge does."

Q. "You don't want to answer my question then?"

A. "I ain't going to answer that question either."

There are various charges and counter-charges, as is usual in a case of this kind, but it is unnecessary to recount them here. The fact is that the only real change of conditions that has taken place since the custody was awarded to Linda is that she left the children with Arnold during the school year in which she and her husband were finding employment and establishing a good home and environment for them. In this respect the change in conditions was more favorable to her side of the case.

The trial court made no findings of fact. Had a finding been made to the effect that a change in conditions had taken place which warranted a transfer of custody, it would have been clearly erroneous. Sound policy has recognized through the years that, all other things being equal, the welfare of small children ordinarily is best served if they are with their mother. Hinton v. Hinton, Ky., 377 S.W.2d 888, 889 (1964). It is our opinion that the custody of these children should be restored to their mother subject to reasonable visitation by or with the father.

The judgment is reversed for entry of a new order in conformity with this opinion.

All concur.